**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MARK A.F., | |
| Plaintiff, | |
| | Case No. 22 C 1518 |
| v. | |
| | Magistrate Judge Sunil R. Harjani |
| KILOLO KIJAKAZI, | |
| Acting Commissioner of Social Security, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mark A. F. brings this action seeking judicial review of the Acting Commissioner of Social Security Administration's decision denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Mark requests reversal of the ALJ's decision and remand, and the Acting Commissioner moves for summary judgment affirming the decision. For the reasons set forth below, the Court affirms the ALJ's decision.

## I. BACKGROUND

Mark filed his application for DIB on January 4, 2018, alleging an onset date of September 7, 2017. Mark, who was 46 years old at the time of his last hearing before the ALJ, claims his learning disability and low stamina prevent him from working. According to his IQ testing, Mark's intellectual abilities are in the borderline to low average range. Mark completed high school with special education assistance in a specialized social setting. He also had an Individualized Education Plan throughout his schooling. Mark has prior work experience as a cart attendant and fast-food worker. Since July 2018, Mark has been working part-time as a line server at Qdoba where he puts ingredients on burritos and nachos.

Pursuant to Defendant's Agreed Motion for Reversal with Remand, this Court reversed and remanded the ALJ's decision for further proceedings on April 28, 2021. *Mark A.F. v. Kijakazi*, Case No. 20 C 5812, Docs. 20-22 (N.D. Ill). On remand, the administrative law judge ("ALJ") held a new hearing and issued a written decision on November 26, 2021, again denying Mark's application. (R. 626-93). The ALJ concluded that Mark's developmental disorder, neurocognitive disorder, bordering intellectual functioning, and attention deficit hyperactivity disorder ("ADHD") were severe impairments but did not meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 632-36. The ALJ specifically considered Listings 12.02 (neurocognitive disorders), 12.05 (intellectual disorders), and 12.11 (neurodevelopmental disorders). *Id.* at 633-36. Under the "Paragraph B" analysis, the ALJ found that Mark had moderate limitations in the four functional areas of understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. *Id.* at 633-34.

The ALJ then determined that Mark had the residual functional capacity ("RFC") to perform a reduced range of medium work except he can: (1) occasionally climb ramps and stairs; (2) never climb ladders, ropes or scaffolds; (3) occasionally balance; (4) frequently stoop, kneel, crouch, and crawl; and (5) never work at unprotected heights or around moving mechanical parts. (R. 636). With respect to Mark's mental RFC, the ALJ found that due to his moderate limitations in concentration, persistence, or pace, Mark is restricted to understanding, remembering, and carrying out simple instructions for simple, routine, and repetitive tasks but not at a production rate pace (e.g. assembly line work). *Id.* The ALJ further found that Mark is able to interact with supervisors frequently and coworkers occasionally and can tolerate brief, superficial interaction with the public. *Id.* The ALJ indicated that Mark can be exposed to no more than occasional

changes in the job setting. *Id*. Given this RFC, the ALJ concluded that Mark would not be able to perform his past relevant work as a cart attendant or fast-food worker. *Id*. at 646. Based on the vocational expert's testimony, the ALJ determined that Mark was not disabled because he can perform jobs existing in significant numbers in the national economy, including cleaner II, kitchen helper, and warehouse worker. *Id*. at 646-47.

## II. <u>DISCUSSION</u>

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform his former occupation; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quotation marks omitted).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla" and means "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, --- U.S. ----, 139 S.Ct. 1148, 1154 (2019) (quotation marks omitted). In reviewing an ALJ's decision, the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (quotation marks omitted). Nevertheless, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Mark argues that the ALJ's decision must be reversed and remanded because his analysis of certain mental opinion evidence was deficient, including the ALJ's evaluation of the opinion of the one-time examining clinical psychologist, Lisa Konick, Ph.D., and the opinion of the testifying psychological expert, Nancy Winfrey, Ph.D.[1] Having considered these arguments and the record, the Court finds that the ALJ did not commit reversible error and the ALJ's decision is supported by substantial evidence.

**A.      Examining Psychologist Lisa Konick, Ph.D.**

Mark first argues that the ALJ failed to properly evaluate the opinion evidence from Dr. Konick. As Mark filed his claim for benefits after March 27, 2017, the ALJ's evaluation of the medical opinion evidence was governed by 20 C.F.R. § 404.1520c. Under that regulation, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ need only articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). The regulations direct the ALJ to consider the

---

[1]      Mark does not challenge the ALJ's handling of the other medical opinions, including the opinions of the state agency reviewing psychologists.

persuasiveness of medical opinions using several listed factors. *See* 20 C.F.R. § 404.1520c(a), (c). Supportability and consistency are the two most important factors, and an ALJ must explain how he considered those factors in his decision. 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2). An ALJ is not required to explain how he considered the other factors. 20 C.F.R. § 404.1520c(b)(2).

In October 2019, examining psychologist Dr. Konick evaluated Mark's intellectual functioning and adaptive abilities. (R. 607-25). She conducted a clinical interview with Mark and his mother, reviewed psychological and educational records, conducted a multi-method psychological assessment, and completed a psychological evaluation report. *Id.* The Woodcock-Johnson Tests of Cognitive Abilities, Fourth Edition indicated that Mark's general intellectual ability score was 77, which was within the borderline impaired range compared to others of his chronological age and comparable to that of an average 10-year old. *Id.* at 612. His short-term working memory was in the low average to average range. *Id.* at 613. His cognitive processing speed was borderline to low average. His perceptual speed was in the low average to average range. *Id.* Mark's cognitive efficiency score was low average to average. *Id.* As part of her behavioral observations, Dr. Konick noted that Mark was passive during the evaluation and only responded when directly questioned. *Id.* at 612. Dr. Konick stated that Mark tended to respond to everything in a positive manner, was overly optimistic, and had limited insight. *Id.*

Dr. Konick diagnosed intellectual disability of moderate severity and ADHD, combined presentation. (R. 617). Although his symptom profile appeared consistent with an ADHD diagnosis, Dr. Konick opined that the majority of Mark's challenges were better accounted for by his developmental delays and borderline cognitive functioning. *Id.* Dr. Konick opined in part that:

> (1) Mark will require assistance and supervision to effectively manage his long-term financial affairs, medical appointments and communications with medical personnel, activities of daily living ("ADLs"), and medications (when necessary);

(2) his cognitive and memory functions are not expected to improve to independent levels, even with proper medications(s) and/or intensive therapy;

(3) he requires support in multiple domains of ADLs.  While Mark may care for personal needs (involving eating, dressing, elimination, and hygiene) and household tasks, he is likely to require monitoring, ongoing reminders, and re-teaching in order maintain functional levels of independence in those areas;

(4) independent employment in jobs that require limited conceptual and communication skills can be achieved, but considerable support will be needed from supervisors and co-workers to manage the social expectations, job duties, and responsibilities such as benefits, transportation, scheduling, and financial management. Significant social and communicative support, monitoring, and re-training will be needed in work settings to maintain success;

(5) with the appropriate training, supervision, and support, Mark has the potential to perform simple vocational duties that rely on rote learning, simple instructions, and repetition. However, complex tasks are mentally taxing on Mark and thereby impact his stamina for sustaining attention and exerting mental effort for an extended period of time;

(6) Mark will require extensive support, monitoring, supervision, and re-training to be effective in his work environment; and

(7) Mark experiences notable difficulties with expressive communication and executive functioning, including the ability to follow multi-step instructions, problem solve, retain information, and sustain attention.  He will benefit from the assistance of a job coach to assist him with effective communications within the scope of his employment. This includes support during performance reviews or other situations where he is in a position to advocate for his needs in the workplace.

*Id*. at 618-19.

On October 9, 2021, Dr. Konick provided clarification of her clinical impressions and responded to the testimony provided by Dr. Winfrey, who testified that she believed Mark's primary diagnosable issue is untreated ADHD and not the intellectual disability. (R. 937-44).  Dr. Konick explained that she disagreed with Dr. Winfrey's position that Mark is "'living independently' and that the primary crux of his challenges are due to unmedicated ADHD." *Id*. at 937.  Dr. Konick opined that Mark has "marked" limitations (defined as "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited") in his

ability to: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id*. at 938-40.

In assessing the mental RFC, the ALJ found Dr. Konick's opinion of marked deficits in the four areas of work-related mental functioning to be only partially persuasive because it was not supported by the longitudinal record, Mark's treatment, the mental status examination findings, Mark's daily activities, and Mark's testimony. (R. 644). Rather, the ALJ determined that the evidence in the record, including part of Dr. Winfrey's testimony and the moderate limitations identified by the state agency psychological consultants, supported a conclusion that Mark had moderate limitations in all four areas of mental functioning. *Id*.

### i. Understanding, Remembering, or Applying Information

As to the first functional area, Mark argues that the ALJ erred in discounting Dr. Konick's opinion that Mark required extensive support, monitoring, supervision, and re-training to be effective in his work environment. Mark contends that the ALJ improperly relied heavily on Mark's own testimony, noting that Mark stated he needed reminders only "once in a while" on how to do a task, he reported that everything was "going well" at his Qdoba job, he felt confident he could perform his duties, and he testified that he did not think he needed more monitoring than other employees, without recognizing that significant evidence indicated that Mark had limited insight into his own functional limitations. (R. 644). Similarly, the ALJ found Dr. Konick's statement that Mark "continues to require reminders for repetitive daily tasks such as washing his hands" inconsistent with Mark's testimony that he did not need reminders to wash his hands. *Id*. at 644, 939. As support, Mark cites to the finding of consultative examiner Olga Green, Psy.D., that Mark demonstrated fair insight of issues and problems he faces. *Id*. at 522. Mark cites a vocational evaluation from 1991 where the evaluator noted that at times, Mark did not recognize

the need for assistance. *Id*. at 355. Mark also relies on his mother's testimony that he is very optimistic about his abilities and that he thinks everything is fine. *Id*. at 85. Mark cites the findings of Dr. Konick, noting that he tended to respond to everything in a positive manner and was overly optimistic, his insight was limited, his social judgment is limited, he is unlikely to assess situations adequately or effectively advocate for himself, and he lacks insight into his diagnostic picture and his functional limitations. *Id*. at 612, 617, 941. Finally, Mark cites to a letter from his previous supervisor, Rebecca Dworak, to show that his perception of his limitations differs significantly from her explanation of his abilities and functional limitations. *Id*. at 390-91.

While it may be true that the ALJ did not mention every detail cited by Mark, an "ALJ is not required to mention every piece of evidence." *Combs v. Kijakazi*, 69 F.4th 428, 435 (7th Cir. 2023). Rather, ALJs "may not ignore an entire line of evidence that supports a finding of disability." *Id*. (internal quotation marks and citation omitted). Contrary to Mark's assertion, the ALJ's analysis did not ignore an entire line of evidence of Mark's limited insight into his own functional difficulties. For instance, the ALJ specifically considered Mark's mother's testimony that Mark is very optimistic about his abilities and that she had to help him properly fill out a form about his functional limits because he initially filled it out as if everything was fine. (R. 638). The ALJ acknowledged Dr. Konick's statement that Mark tended to respond to everything in a positive and overly optimistic manner with limited insight. *Id*. at 640. The ALJ noted Dr. Green's finding that Mark had fair insight. *Id*. at 643. The ALJ also reviewed Ms. Dworak's statement that Mark required several additional weeks of training, additional redirection and reminders of simple tasks, and additional time to retain and recall task-oriented details. *Id*. at 645.

In any event, aside from Mark's testimony, the ALJ identified other substantial evidence to support his conclusion. The ALJ pointed to numerous other medical records which demonstrate

Mark's ability to understand, remember, or apply information and support a finding that his limitations in this area are less than marked, including: (1) a December 2017 primary care note documenting normal judgment, normal attention span, and intact short term memory, and (2) an April 2018 psychological consultative evaluation noting Mark was a reliable historian, his remote memory was good, his fund of knowledge was good, he passed the 30-minute memory check of recalling one word, he performed serial threes, and he demonstrated fair judgment. (R. 448, 519, 521-22, 633). The ALJ cited two treating provider notes that did not indicate any difficulty with Mark understanding treatment recommendations, maintaining conversation in the treatment setting, or asking appropriate questions. *Id.* at 530-38, 599-602, 633. In assessing Dr. Konick's opinion on this issue, the ALJ also relied on Ms. Dworak's statement that with additional training time and supervision, she knew Mark would remember and retain his task responsibilities at Qdoba. *Id.* at 391, 644. The ALJ noted Dr. Konick's own opinion that Mark had the potential to perform simple vocational duties that rely on rote learning, simple instructions, and repetition which is consistent with RFC assessed by the ALJ. *Id.* at 618, 644. The ALJ further explained that Mark's mother testified that he had no other warnings or discipline issues while employed part-time at Target for 23 years (other than the meal issue which led to his termination),[2] Mark had "a little support" after his supervisor Ms. Dworak left Target, and he was terminated from Target due to the food items taken without paying (as opposed to job performance). Additionally, in finding that Mark has no more than a moderate limitation in the first domain, the ALJ relied on Mark's ability to obtain a driver's license, drive to and from work, perform some household chores, shop (wherein he would be required to manage money), and obtain employment on his own (such as with Mariano's). *Id* at 644. Finally, Dr. Konick's assessment of marked limitations in

---

[2]    While working at Target, Mark took a meal and forgot to pay for it.

understanding, remembering, or applying information was inconsistent with the opinions of state agency psychologists and testifying psychologist Dr. Winfrey that Mark had moderate limitations in this area. *Id*. at 101, 116, 633, 672-73. Thus, any alleged error in overemphasizing Mark's testimony given his lack of insight into his difficulties is harmless as the ALJ gave other supported reasons for rejecting Dr. Konick's finding in this regard.

Mark next contends that the ALJ erred in the way he cited Ms. Dworak's statement that she knew Mark would remember and retain his task responsibilities even if he required additional time and supervision to learn his Qdoba position. According to Mark, the ALJ focused on this one sentence of Dworak's two-page letter which was "disingenuous in the context of the statement and the letter as a whole." Doc. 15 at 6. Mark points out that the letter highlighted numerous limits and extra help which Ms. Dworak and other employees provided him. However, the ALJ discussed Ms. Dworak's third-party statement in greater detail immediately following his analysis of Dr. Konick's opinion. (R. 645). Although the ALJ did not address every statement from Ms. Dworak's letter, he did acknowledge Ms. Dvorak's statements about Mark's limits and the additional training he needed to learn his position. The ALJ pointed to Ms. Dworak's statements indicating Mark required several additional weeks of training, had difficulty multi-tasking, was sometimes easily distracted by others, was afforded extra time to complete daily food preparation tasks, required additional redirection and reminders of simple tasks, required numerous demonstrations and a deeper explanation, and required additional time to retain and recall task-oriented details. *Id*. Despite needing more time and supervision to learn his position, Ms. Dworak added that she knew Mark would remember and retain his task responsibilities. *Id*. at 391. Given this discussion of the evidence, the ALJ was not impermissibly selective in his analysis of Ms. Dworak's letter. *Gedatus v. Saul*, 994 F.3d 893, 901 (7th Cir. 2021) ("all summaries must be partial and selective.").

In her November 2019 report, Dr. Konick observed that "[w]ith the appropriate training, supervision, and support, Mark has the potential to perform simple vocational duties that rely on rote learning, simple instructions, and repetition." (R. 618). The ALJ explained that this finding was inconsistent with Dr. Konick's subsequent determination that Mark had a marked limitation in the ability to understand, remember, or apply information. *Id*. at 644, 938-39. Mark complains that the ALJ "did not explain his conclusion" and "pointed to no evidence that those limits [by Dr. Konick] were inconsistent with marked limits [in] understanding, remembering, or applying information." Doc. 15 at 6. The Court disagrees. Evidence that Mark had the potential to perform simple work duties that rely on rote learning, simple instructions, and repetition is arguably in tension with a "marked" limitation in overall functioning in the area of understanding, remembering, or applying information. In other words, the conclusion that Mark's functioning in performing simple vocational duties that rely on rote learning, simple instructions, and repetition is not limited as long as he receives appropriate training, supervision, and support means that he is not "seriously limited" in his ability to function independently, appropriately, or effectively, and on a sustained basis in these specific abilities of understanding, remembering, or applying information. For this reason, the ALJ did not have to specifically explain in great detail how Dr. Konick's marked finding in this overall functional area is inconsistent with her prior recommendation. Accordingly, the Court finds that the ALJ reasonably concluded that Dr. Konick's own recommendations, where she concluded that Mark had the potential to perform simple vocational duties that rely on rote learning, simple instructions, and repetition, contradicted her finding in her subsequent report that Mark had an overall marked limitation in understanding, remembering, or applying information.

Another basis given by the ALJ for discounting Dr. Konick's opinion that Mark has marked limitations in the first area of mental functioning is that it is inconsistent with Mark's activities, including his ability to obtain a driver's license, drive to and from work, perform some household chores, shop (where he would be required to manage money), and obtain employment on his own at Mariano's. (R. 644). Mark's argument that the ALJ did not explain how those activities were inconsistent with the marked limitation Dr. Konick identified is not well taken. The ALJ did not explicitly explain how he reached this conclusion, but it is otherwise apparent from the ALJ's decision. The opinions of the two state agency psychological reviewers and the testifying psychological expert provide support for the ALJ's finding that Mark's activities of daily living were inconsistent with a marked limitation in this domain. Both agency psychologists specifically noted consideration of Mark's daily activities in reaching their Paragraph B findings, including that Mark can care for his personal needs, prepare simple meals, shop, handle simple money, complete routine household chores, go out independently, drive on his own, and maintain a job. *Id*. at 102-03, 117-18. The ALJ found the state agency psychologists' conclusion that Mark's mental impairments caused only a moderate restriction in the area understanding, remembering, or applying information persuasive. *Id*. at 641. Additionally, the ALJ relied on the testifying psychological expert's finding of a moderate degree of limitation in understanding, remembering, and applying information which took into account Mark's daily activities, including that he is basically independent with his personal needs and household chores with the mild exceptions of his mother supervising his money and giving him reminders, he has been successful with his jobs, he goes out independently, and he drives, *Id*. at 671, 674, 677, 682. The ALJ found Dr. Winfrey's opinion that Mark had moderate functional limitations in this area persuasive. *Id*. at 642-43. In the context of the ALJ's decision as a whole, the ALJ's failure to elaborate his reasoning was not

error because the Court can trace his reasoning regarding how Dr. Konick's opinion was inconsistent with Mark's activities. *Arnette R. v. Kijakazi*, 2023 WL 3043199, at *4 (N.D. Ill. April 23, 2023) (if an ALJ's "opinion enables [the court] to trace the path of the ALJ's reasoning, the ALJ has done enough.") (quoting *Stephen v. Heckler*, 766 F,2d 284, 287 (7th Cir. 1985)).

Mark also argues that the ALJ failed to consider Mark's qualifications and limits in performing his daily activities. Specifically, Mark contends that the ALJ overlooked evidence that he did not obtain his driver's license until age 21 with substantial practice and extensive learning, that he could not drive to unfamiliar places, that he only drove short distances and not on the highway, that his mom helped him with laundry and it took him a long time to learn how to do the laundry, that he needed reminders to pick up his room, and that he could not mow the lawn because it was too difficult.[3] Doc. 15 at 7-8. True, the ALJ did not mention all of these qualifications but he acknowledged that Mark was "able to perform bathing and grooming but sometimes needed reminders," "could prepare food, do laundry, and pick up his room, but occasionally needed reminders," and "needed reminders regarding clothing and grooming when getting ready for work" (R. 634, 637, 638); *see also id*. at 641. Moreover, the ALJ cited Mark's testimony that he has no difficulty doing laundry, but his mother helps him anyway. *Id*. at 637 (citing *id*. at 58). The ALJ also considered Mark's mother's testimony that she has to remind him to shower, shave, and brush his teeth and she managed his doctors' appointments. *Id*. at 638. The ALJ further noted that Mark attended a vocational group three days a week and received help with job applications and interview practice when he was hired for his job at Qdoba. *Id*. at 637. Although Mark did take longer to earn his driver's license and limits his driving to familiar areas, this qualification does

---

[3] Mark claims the ALJ also ignored evidence that he could take the garbage out once a week but sometimes needed reminders. Doc. 15 at 7. However, as the ALJ noted, Mark actually testified that he "took the garbage out once a week and sometimes had to remind his mother." (R. 60, 637).

not refute his ability to obtain a driver's license and drive himself to and from work. *Id*. 644. Given this evidence cited in the decision, the ALJ sufficiently considered Mark's limitations in performing daily activities.[4]

Mark next takes issue with the ALJ's finding that Dr. Konick's opinion of marked limits in understanding, remembering, or applying information was inconsistent with Mark's mother's testimony that Mark no warnings or discipline issues during his 23-year job with Target, aside from the single issue of taking a meal and forgetting to pay for it which led to his termination. (R. 644). According to Mark, the ALJ did not explain how a lack of warnings or discipline issues on the job "spoke to [his] problems understanding, remembering, or applying information" and there is "no logical connection between the two." Doc. 15 at 9. While the ALJ did not expressly explain how that evidence is relevant to Mark's ability to understand, remember, or apply information, the connection is readily apparent. A marked limitation in the ability to understand, remember, or apply information could be a significant barrier to satisfactorily learning and performing job tasks. Thus, a lack of warnings or discipline issues in Mark's 23-year job could reflect a lesser degree of severity and is a sufficient reason to discredit Dr. Konick's opinion.

---

[4] Mark further argues that the ALJ did not consider qualifying evidence when he concluded that Mark obtained the Mariano's job on his own. As the ALJ correctly pointed out, Mark testified that he got the job at Mariano's before he joined the Vocational Rehabilitation Services (VRS) program. (R. 64-65, 637). The ALJ also correctly noted that Mark's mother testified that Mark applied for the job at Mariano's by himself. *Id*. at 73, 638. Mark now claims that he may have been confused about the timeline because records from VRS indicate that he was receiving services from there about the same time he applied for and obtained the job at Mariano's. Doc. 15 at 8; Doc. 22 at 8. Additionally, Mark claims that his mother's testimony that he "went over himself and applied" for the Mariano's job does not indicate that he received no help from the VRS program because he could have applied on his own and received help obtaining or completing the application. But Mark overlooks the fact that his mother confirmed that he got "the job at Mariano's before he actually had any formal assistance at vocational rehab" program. (R. 83). Nevertheless, even if the ALJ was incorrect on this point that Mark had the ability to obtain the job at Mariano's on his own, the error was harmless because the ALJ provided other substantial evidence to support his finding that Mark's daily activities undermined Dr. Konick's opinion with respect to the first domain.

Finally, Mark argues that the ALJ selectively discussed his mother's testimony and improperly implied that he did not receive help after Ms. Dworak left Target. But the ALJ correctly noted that Mark's mother testified that he was given "a little" more support than other employees at Target once Ms. Dworak left. (R. 81, 644). Mark contends that the ALJ failed to note that his mother also indicated that other people at Target looked out for him and helped him when Ms. Dworak left Target. Mark is incorrect. Mark's mother testified that at the time Ms. Dworak left Target, Mark "had a lot of friendships that he had built up over the years" and these friends "kind of looked out for him a little bit." *Id*. at 81. Consistent with the testimony, the ALJ noted that Mark's mother testified that Ms. Dworak "took great care of [Mark] and other people took over this role when she left." *Id*. at 81, 638. Further, the ALJ noted that Mark "was given some support from coworkers after Rebecca left." *Id*. at 638. Based on this record, the ALJ appropriately considered Mark's mother's testimony and did not cherry-pick evidence in his assessment that Dr. Konick's opinion that Mark's limits in the first domain were marked was inconsistent with Mark's mother's testimony.

### ii. Interacting with Others

Regarding the domain of interacting with others, the ALJ found Dr. Konick's assessment of a marked limitation inconsistent with Mark's testimony, his having a girlfriend, hanging out with friends, going to restaurants, sporting events, and movie theaters, and his social supports. (R. 644). The ALJ determined that Mark had a moderate limitation in interacting with others, noting his statement that he got along with others without problems but did not handle stress well. *Id*. at 633. The ALJ found some evidence of impairment with social skills. *Id*. However, the ALJ also noted that Mark's mother stated that he enjoyed social activities and being with adults. *Id*. The ALJ reviewed Dr. Green's consultative examination which indicated Mark an appropriate attitude, demeanor, and degree of cooperation. *Id*. at 519, 521, 633. Dr. Green noted that Mark is viewed

15

as friendly and he reported having a girlfriend for 10 years. *Id*. at 520, 633. The ALJ noted that Mark went out with friends or his girlfriend, participated in a bowling league, went to the movies and the library, shopped in stores, and went to restaurants. *Id*. at 633, 637, 641. The ALJ considered Mark's reports of his ability to interact with others during a February 2018 assessment at Alexian Brothers, including that he had good relationships with his employer/supervisor and with coworkers and had a good relationship with his mother and brother. *Id*. at 493, 499, 633. The ALJ noted that a vocational assessment found no impairment with Mark's ability to establish and maintain appropriate relationships with others in the workplace, but that he had some impairment with communications skills. *Id*. at 480-81, 633. The ALJ reviewed Dr. Konick's November 2019 evaluation reflecting that Mark was quiet and passive, responding only when directly asked questions but also that he was very easy going, generally in a good mood, did not perseverate on negativity, went to sports bars with friends, and was involved with his peers. *Id*. at 610, 612, 633. The ALJ noted that Ms. Dworak described Mark as "social" with team members. *Id*. at 391, 633. Finally, the ALJ relied on the opinions of the state agency psychological consultants that Mark is moderately limited in the domain of interacting with others. *Id*. at 101, 116, 641, 644.

Mark asserts that the ALJ did not discuss numerous qualifications to his activities and failed to explain why any of those activities, considering his qualifications, undermined Dr. Konick's opinion. Mark's contention that the ALJ impermissibly cherry-pick evidence in support of his conclusion is misplaced. Even though the ALJ did not specifically mention each piece of evidence Mark cites, the ALJ did not disregard an entire line of evidence pertaining to his social difficulties. Doc. 15 at 10. For instance, the ALJ noted Dr. Konick indicated that Mark was quiet and passive and only responded when directly asked questions. (R. 633, 640). Moreover, the ALJ specifically cited the functional limitation evaluation and individualized plan for employment to which Mark

16

points and summarized some of the qualifications Mark highlights, which indicates that the ALJ was aware of and considered these records. *Id*. at 639. By way of example, the ALJ noted that the functional limitation evaluation found no impairment in Mark's interpersonal skills but found some impairment in his communication skills as evidenced by his lack of communication when he forgot to pay for a meal at Target which resulted in his termination. *Id*. at 478, 480-81, 633, 639. The ALJ also noted that the individualized plan for employment indicated that Mark struggled with social cues and expressing himself. *Id*. at 467, 639. Further, the ALJ found persuasive the moderate social limitations of the state agency psychologists who specifically considered the functional limitation evaluation and individual plan for employment. *Id*. at 100, 115, 641, 644. Again, Mark does not challenge the ALJ's reliance on the opinions of the state agency psychological consultants, who are "highly qualified and experts in Social Security disability evaluation." 20 CF.R. § 404.1513a(b)(1). Having considered the ALJ's decision as a whole, the Court finds that the ALJ considered the relevant evidence, including specific references to Mark's testimony, his mother's testimony, his medical records, his vocational records, and the opinions of the state agency psychologists, and provided sufficient detail to enable the Court to trace his reasoning. *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019) ("The court applies a common-sense reading of the entirety of an ALJ's decision."). Thus, the ALJ adequately articulated his reasons for finding the evidence inconsistent with Dr. Konick's opinion of a marked limitation in interacting with others.

### iii. Concentration, Persistence, or Maintaining Pace

The ALJ determined that Dr. Konick's finding of a marked limitation in concentration, persistence, or maintaining pace was not supported by the record and internally inconsistent with her own finding that Mark "appears to be performing at moderate pace, with supports and accommodations, during 4-5 hour works shifts." (R. 644, 940). In finding Dr. Konick's marked

17

limitation opinion internally inconsistent, the ALJ noted that Dr. Konick did not "definitely identify what supports and accommodations" Mark had at work. The ALJ also found Dr. Konick's statement that he had "supports and accommodations" at work inconsistent with Mark's report that he did not think he needed more monitoring than others, did not have a job coach, was able to obtain the job at Mariano's prior to VSR assistance, was always on time to his job, and had no other warnings or discipline issues. *Id*. at 644.

Mark challenges the ALJ's finding that Dr. Konick's opinion is internally inconsistent with her statement that Mark was "performing at a moderate pace." Mark contends that the ALJ took Dr. Konick's statement out of context because Dr. Konick's marked rating was based on the expectation of full-time employment. Doc. 15 at 11. Mark also avers that the ALJ was mistaken that Dr. Konick did not specify Mark's supports and accommodations at work. Finally, Mark argues the ALJ erred in discounting Dr. Konick's statement that he had "supports and accommodations" at work based on Mark's reports about his abilities because he lacks insight into his difficulties. *Id*. at 11-12.

Even if the ALJ erred in any of the ways Mark identifies, such error was harmless because the ALJ relied on much more than a mere scintilla of other evidence in finding Dr. Konick's marked concentration, persistence and pace limitation not supported by the record. *Dorothy B. v. Berryhill*, 2019 WL 2325998, at *5 (N.D. Ill. May 31, 2019). First, the ALJ recounted Mark's mother's statements that he was better with verbal instructions and did better with consistency but once he learned a task, he was "pretty good." (R. 271-72, 317-18, 634). Second, with respect to a lack of support in the medical records, the ALJ noted that Mark was found to have a normal attention span at a mental status examination on December 22, 2017, appropriate sustained attention during a February 2018 assessment at Alexian Brothers, and normal concentration at a November 28, 2018

internal medicine consultative examination. *Id*. at 448, 501, 536, 634, 640. Fourth, the ALJ considered a vocational assessment which found Mark did not have difficulties concentrating. *Id*. at 467, 639. Fifth, the ALJ noted that consultative psychological examiner Dr. Green found that Mark's concentration and attention were appropriate, his ability to concentrate on and understand directions was good, and his ability to carry out tasks with reasonable persistence and pace was fair. *Id*. at 521, 522, 634, 643, 640. Fifth, regarding the opinion evidence, the ALJ relied on the findings of the state agency psychologists and testifying psychological expert Dr. Winfrey that Mark had a moderate restriction in the domain of concentration, persistence, or maintaining pace. *Id*. at 102, 116, 641-44. Mark does not show how this substantial evidence does not support the ALJ's finding. Viewing the ALJ's decision as a whole, the ALJ identified ample evidence that did not support Dr. Konick's marked limitation in the area of concentration, persistence, and pace.

### iv.     Adapting or Managing Oneself

As it related to adapting or managing oneself, the ALJ found Dr. Konick's finding of marked limitations to be not supported by the longitudinal record, particularly regarding Mark's ability to generally dress and groom himself independently (needing only reminders at times), go out with friends and be the driver during such activities, get himself to and from work on time and not call in sick, go out alone, go to medical appointments unaccompanied, visit his brother, and care for his nephew.[5] (R. 644). Mark argues the ALJ erred in finding Dr. Konick's opinion not fully persuasive on these grounds because: (1) the testimony of Mark and his mother do not support that he was able to independently dress and groom himself with only reminders "at times"; (2)

---

[5]     Elsewhere in the opinion in finding Mark had moderate, rather than marked, limitations in the area of adapting or managing himself, the ALJ also noted that Mark had no inpatient psychiatric treatment or hospitalizations, he performed basic household chores such as laundry, cleaning his room, and taking out the garbage, he was able to prepare his own meals three times a day, go bowling, and go out with his girlfriend. (R. 634).

there is no obvious connection between the ability to go out with friends and to drive during those activities and marked limits adapting and managing himself; (3) the evidence that Mark visits his brother and cared for his nephew does not address his ability to adapt or manage himself; (4) there was minimal evidence Mark visited his brother or watched his nephew; and (5) the ALJ's finding that Dr. Konick's opined marked limits was inconsistent with his ability to attend medical appointments unaccompanied ignored his difficulty advocating for himself and his demonstrated lack of insight. Doc. 15 at 13-14.

The Court finds no reversible error related to the ALJ's discounting of Dr. Konick's opinion on this issue. More than a mere scintilla of evidence supports the ALJ's conclusion that Mark was generally able to dress and groom himself independently with reminders at times because: (1) Mark testified that he did not need reminders to wear his uniform to work (R. 64); (2) Mark stated to Dr. Green that he sometimes needs reminders to shower (*Id*. at 521); (3) Mark lived on his own with a disabled friend of the family for one year and there was no evidence that he needed reminders regarding dressing or grooming (*Id*. at 76-78, 638); (4) the ALJ considered the September 2017 vocational assessment and functional limitation evaluation indicating Mark had no impairment in self-care and no difficulties with poor hygiene/grooming (*Id*. at 570, 578-79, 639); and (5) the ALJ specifically considered Mark's mother's testimony cited by Mark indicating that she reminds him to shower, shave, and brush and he would not do so without reminders because grooming is not important to him (*Id*. at 79, 85, 638). In discounting Dr. Konick's finding that Mark had marked limitations in the functional area of adapting or managing himself, the ALJ also pointed to Mark's ability to go out with friends, drive to those activities, visit his brother, and care for his nephew. The regulations make clear that the ability to regulate emotions, control behavior, make independent plans, and safely maintain your well-being by being aware of normal

hazards and taking appropriate precautions is relevant to assessing the degree to which mental impairments impact the ability to adapt and manage oneself. 20 C.F.R. § 404, Subpt. P, App. 1, § 12.00E(4). Thus, the ALJ properly considered Mark's ability to go out on his own with friends, drive safely to those activities, visit with his brother, and watch his nephew as one part of weighing Dr. Konick's opinion.

Mark next asserts that the ALJ improperly relied on his ability to visit his brother because there was minimal evidence about Mark visiting his brother, including how frequently or for how long he visited, where the brother lived, or what they did together. However, Mark's mother stated that Mark visits his brother "on a regular basis" and the record indicates that Mark has a "good" relationship with his brother who lives in Arlington Heights. (R. 270, 316, 499, 555, 608). As such, the ALJ did not err in considering that Mark visits his brother. Mark makes much of the ALJ's reliance on his ability to care for his nephew, arguing that the ALJ did not have enough information to conclude that this evidence undermined Dr. Konick's opinion as there is only one mention of Mark watching his nephew with no details.[6] Regardless, the ALJ reference to this evidence was only a small part of his supportability analysis which was otherwise supported with substantial evidence. Thus, if there was any error in the ALJ noting Mark watched his nephew, the Court finds it was harmless and does not justify reversal. Finally, as previously discussed, the ALJ did not ignore evidence regarding Mark's lack of insight or his communication problems. *Id*. at 638, 639, 640, 643. In short, Mark argues for a different interpretation of the evidence regarding his ability to adapt and managing himself but this does not entitled him to reversal.

Moreover, the ALJ's finding that Mark is moderately limited in his ability to adapt or manage himself is supported by substantial evidence in the record. (R. 634). The ALJ found Mark

---

[6] During a mental health assessment with Alexian Brothers in February 2018, Mark reported: "I'm good at bowling, watching my nephew." (R. 509-10).

more limited than the state agency psychologists, who found Mark had a mild limitation in adapting and managing himself. *Id*. at 102, 116. Likewise, Dr. Winfrey found that Mark had none-to-mild limitations in adapting or managing himself because there was no evidence of difficulty for him in terms of regulating his emotions or controlling his behavior. *Id*. at 673. Because the ALJ's moderate limitation is "more limiting than that of any state agency [] psychologists," his finding "illustrat[es] reasoned consideration given to the evidence [Mark] presented." *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019).

**B.      Testifying Psychologist Nancy Winfrey, Ph.D.**

Next, Mark takes issue with the ALJ's assessment of the medical opinions of Dr. Winfrey, who testified at the hearing on September 10, 2021. (R. 669-83). Dr. Winfrey opined that Mark had moderate limits in his ability to understand, remember, or apply information and in his ability to concentrate, persist, or maintain pace but none to mild limitations in interacting with others and adapting or managing himself. *Id*. at 672-73. The ALJ concluded that Dr. Winfrey's opinion was partially persuasive. *Id*. at 643. Regarding supportability, the ALJ noted that Dr. Winfrey "supported her findings with a detailed explanation and review of the evidence." *Id*. Nevertheless, the ALJ found Dr. Winfrey's opinion not entirely consistent with the evidence and that the overall record supported additional limitations, particularly moderate limits in interacting with others and adapting and managing oneself. *Id*.

Mark asserts that the ALJ failed to "indicate what evidence was consistent or inconsistent, or what evidence supported or did not support Dr. Winfrey's opinions," in violation of 20 C.F.R. § 404.1520c. Doc. 15 at 15. Considering the ALJ's decision as a whole, the Court finds that the ALJ adequately addressed the consistency and supportability factors when assessing Dr. Winfrey's opinions. A court may review an ALJ's "determination in light of elaboration and analysis

appearing elsewhere in the decision." *Zellweger v. Saul*, 984 F.3d 1251, 1254 (7th Cir. 2021); *Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021) ("An ALJ need not rehash every detail each time he states conclusions on various subjects.").

Here, the ALJ found the moderate limitations Dr. Winfrey assessed in understanding, remembering, or applying information and concentrating, persisting, or maintain pace persuasive because they were supported by and consistent with record. Earlier in the decision, the ALJ discussed in detail the specific evidence supporting his conclusion that Mark had moderate limitations in these two domains. (R. 633-34). With respect to understanding, remembering, or applying information, the ALJ noted that: (1) a primary care note from December 2017 indicated that Mark had normal memory, normal judgment, and intact attention (*Id*. at 448, 633); (2) the consultative examiner noted Mark was a reliable historian, his remote memory was good, his fund of knowledge was good, he passed the 30-minute memory check of recalling one word, he was able to perform serial threes, and he demonstrated fair judgment (*Id*. at 519, 521-22, 633); and (3) Mark's treating providers did not note any difficulty with him understanding treatment recommendations, maintaining conversation in the treating setting, or asking appropriate questions (*Id*. at 530-31, 599-602, 633). Likewise, Dr. Winfrey's moderate restriction in concentrating, persisting, or maintaining pace is supported by and consistent with the following specific evidence the ALJ cited earlier in the decision: (1) Mark's mother's statement that Mark was better with verbal instructions and did better with consistency but once he learned a task, he was "pretty good"; (2) a December 2017 primary care progress note indicating Mark had normal attention span; (3) the consultative psychological examiner's finding that Mark had appropriate attention and concentration; (4) a February 2018 assessment documenting appropriate sustained attention; and (5) a November 2018 internal medicine consultative examination finding normal concentration.

*Id*. at 271-72, 448, 501, 521, 526, 634, 640. Additionally, Dr. Winfrey's findings of moderate limitations in understanding, remembering or applying information and concentrating, persisting, or maintaining pace is supported by and consistent with the state agency psychologists' moderate limitation findings in these functional areas. *Id*. at 641.

However, with respect to consistency, the ALJ found Dr. Winfrey's conclusion that Mark had mild limitations in interacting with others and adapting and managing oneself were "not entirely consistent with the evidence" and the record supported additional limitations. (R. 643). The ALJ determined that Mark had moderate, rather than none to mild, limitations in interacting with others and adapting and managing oneself. *Id*. Adequate support and explanation for the ALJ's moderate findings in these domains can be found elsewhere in the decision. Regarding interacting with others, the ALJ noted: Mark indicated he got along well with others but did not handle stress well; Mark's mother stated Mark enjoyed social activities and being with adults; he had friends and spent time with them; he was able to maintain a long-term relationship as he had a girlfriend for ten years; he participated in a bowling league, went to the movies, the library, stores, and restaurants; he reported good relationships with his mother, brother, employer/supervisor, and coworkers; vocational assessments noted no impairment with ability to establish and maintain appropriate relationships with others in the workplace, but Mark had some impairment with communication skills. *Id*. at 633. The ALJ also cited Dr. Konick's finding that Mark was pleasant and cooperative during a November 2019 assessment, but he was quiet and passive, responding only when directly asked questions. *Id*. The ALJ noted Dr. Konick's observations that Mark was "very easy going," generally in a good mood, did not perseverate on negativity, went to sports bars with friends, and was involved with peers. *Id*. The ALJ further considered that Ms. Dworak described Mark as "social" with his work team members. *Id*. The

ALJ noted that the functional limitation evaluation and individual employment plan documented some impairment in Mark's communication skills and Mark struggled with social cues and expressing himself. *Id*. at 639. The ALJ also relied on the state agency psychological consultants' finding that Mark had moderate limitations in interacting with others, which was inconsistent with Dr. Winfrey's mild limitation opinion. *Id*. 641. Finally, the ALJ explained that he found a mild limitation in the domain of adapting and managing oneself inconsistent with Mark's difficulty functioning at times and his allegations of trouble handling stress and changes. *Id*.

Accordingly, the Court finds that when considering these portions of the ALJ's decision together, the ALJ sufficiently evaluated the supportability and consistency of Dr. Winfrey's opinion.

## **CONCLUSION**

For these reasons, Plaintiff's request for reversal and remand [15] is denied, and the Acting Commissioner's motion for summary judgment [20] is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is affirmed.

**SO ORDERED.**

Dated: July 13, 2023

_____

Sunil R. Harjani
United States Magistrate Judge

25